IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| April Barnett,<br><br>   Plaintiff,<br><br>  vs.<br><br>Commissioner of Social Security,<br><br>   Defendant. | CASE NO. 3:23-cv-749<br><br>DISTRICT JUDGE<br>James R. Knepp<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff April Barnett filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In February 2020, Barnett filed applications for disability insurance benefits and supplemental security income. Tr. 72, 81. She alleged that she was disabled due to an autoimmune disease, hypertension, diabetes, kidney surgery, psoriasis, arthritis, neuropathy, high cholesterol, and

hyperlipidemia.[1] Tr. 72. Barnett alleged a disability onset date of January 1, 2018,[2] and was last insured on March 31, 2022.[3] *See id*. The Commissioner denied Barnett's applications at the initial level and upon reconsideration. Tr. 70–89, 90–109. Barnett requested a hearing before an Administrative Law Judge (ALJ). Tr. 132–33. In November 2021, an ALJ held a hearing at which Barnett and a vocational expert testified. Tr. 39–69. The ALJ issued a written decision the following month, finding that Barnett was not disabled. Tr. 17–38. Barnett requested Appeals Council review. Tr. 178–81. The ALJ's decision became final in February 2023, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. In April 2023, Barnett filed this action. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ's mental RFC finding is unsupported by substantial evidence because the ALJ failed to properly evaluate the supportability of Dr. Groneck's opinion, and failed to explain why she rejected the opined limitations with respect to Plaintiff's ability to respond appropriately to work pressures.

---

[1] Hyperlipidemia is high cholesterol. *See Hyperlipidemia*, Cleveland Clinic Diseases & Conditions Library, https://my.clevelandclinic.org/health/diseases/21656-hyperlipidemia [https://perma.cc/85FM-N8ER].

[2] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[3] Under Title II, a claimant who is eligible for disability benefits must establish disability on or before his or her date last insured. *See* 20 C.F.R. §§ 404.101, 404.130–31. Barnett alleges a disability onset date of January 1, 2018, and a date last insured of March 31, 2022. Tr. 72. So the relevant time period under Title II runs from January 1, 2018, to March 31, 2022.

> 2. The ALJ's physical RFC finding is unsupported
> by substantial evidence because the ALJ failed to
> develop the record where she declined to either
> obtain a credible medical source statement of
> Plaintiff's standing/walking limitations or order
> a consultative examination to consider critical
> evidence with respect to such limitations.

Doc. 8, at 1.

## Factual background

### 1. Personal and vocational evidence

Barnett was born in March 1967 and was 50 years old on her alleged disability onset date. Tr. 41, 72. She has a high school education and past relevant work as a cashier, delivery person, driving instructor, and driver unloading cars from a train. Tr. 31, 54, 233.

### 2. Medical evidence

In July 2019, Barnett established care with primary care provider Tammy S. Murphy, APRN-CNP,[4] at the Center Street Community Health Center. Tr. 372. Barnett was diagnosed with diabetes in 2015. *Id*. Since then, to the extent that Barnett controlled her diabetes, she controlled it through diet. *Id*. Barnett did not take medication for her diabetes or monitor her blood glucose level at home. *Id*. She hadn't seen a primary care provider in two years. *Id*. Barnett said that she was seeking primary care to address recently-

---

[4]     APRN is an abbreviation for Advanced Practice Registered Nurse. *Advanced Practice Registered Nurse (APRN)*, OhioAPRN.com, http://www.ohioaprn.com/what-is-an-aprn-.html [https://perma.cc/69UR-XX65]. CNP is an abbreviation for Certified Nurse Practitioner. *Id*.

developed symptoms of increased thirst, increased urination, and increased numbness, tingling, and burning in her lower legs and feet. Tr. 372–73.

Murphy found that Barnett's extremities, neurological system, memory, orientation, mood, behavior, affect, insight, judgment, attention span, and concentration were normal and appropriate. Tr. 374. She recorded Barnett's diagnoses including type 2 diabetes mellitus with neuropathy. Tr. 354, 375. Murphy ordered testing, prescribed medication for hypertension and diabetes, and set Barnett up with a home blood glucose monitoring kit. Tr. 376. She instructed Barnett to return for a follow-up in two weeks. *See* Tr. 378. Barnett did not return for six months. *See id.*

Barnett returned to care in January 2020 and had an appointment with Murphy.[5] Tr. 378. Her blood sugar level was dangerously high. Tr. 380. Barnett reported numbness and tingling in her legs and feet and said she felt like she was "walking on needles." Tr. 378. She also reported symptoms of depression and anxiety including suicidal ideation and trouble concentrating. Tr. 380. Barnett's physical and psychiatric exams were normal and appropriate. Tr. 382. Murphy reinstated Barnett's prescriptions—insulin, atorvastatin,

---

[5]     As the Commissioner suggests, it appears from the date and time stamps at the bottom of each page of the Center Street records that Barnett's primary care provider submitted incomplete treatment notes lacking any discernable organizational structure. *See* Doc. 9, at 4 n.1; Tr. 562–614. As such, the recitation of evidence is limited to those facts which could be discerned in the unclear and inconsistent set of records. *See, e.g.*, Tr. 610, 611, 612, 613 (containing nonlinear treatment notes from separate pages and different dates of treatment, namely 6/23/2021, 9/15/2020, 10/07/2020, and 09/04/2020).

metoprolol, glipizide, butalbital-acetaminophen-caffeine, gabapentin, omeprazole, and losartan—and arranged for at-home glucose monitoring supplies.[6] Tr. 383.

In February and May 2020, Barnett had normal physical and mental exams at Center Street. Tr. 386, 388, 394, 397–401. During her May appointment, Barnett specifically denied neurological problems and said that she did not have a burning sensation in her extremities. Tr. 396. She reported trouble concentrating due to depression but no suicidal ideation. *Id*. Murphy found that Barnett's mood and affect were appropriate. *Id*. Her insight, judgment, attention, and concentration were normal. *Id*. Murphy found Barnett anxious, *see* Tr. 396, and also *not* anxious, *see* Tr. 397, without explaining or reconciling her findings.

In June 2020, Barnett established care at the Avita Galion Pain Clinic with Erica L. Clinker, APRN-CNP, for pain management. Tr. 407. Barnett

---

[6]     Atorvastatin lowers cholesterol, metoprolol and losartan treat high blood pressure, glipizide is for high blood sugar levels due to type 2 diabetes, gabapentin treats pain caused by certain nervous system conditions, and butalbital, a barbiturate, treats tension headaches when it is combined with acetaminophen and caffeine. *See* Mayo Clinic Drugs and Supplements Library, https://www.mayoclinic.org/drugs-supplements, (last accessed Jan. 8, 2024): *Atorvastatin*, https://www.mayoclinic.org/drugs-supplements/atorvastatin-oral-route/description/drg-20067003; *Metoprolol*, https://www.mayoclinic.org/drugs-supplements/metoprolol-oral-route/description/drg-20071141; *Losartan*, https://www.mayoclinic.org/drugs-supplements/losartan-oral-route/description/drg-20067341; *Glipizide*, https://www.mayoclinic.org/drugs-supplements/glipizide-oral-route/description/drg-20072046; *Gabapentin*, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011, *Butalbital, Acetaminophen, and Caffeine*, https://www.mayoclinic.org/drugs-supplements/butalbital-acetaminophen-and-caffeine-oral-route/description/drg-20075393.

reported leg swelling, back pain, abdominal pain, joint swelling, and neck pain. *Id*. She said that for two months she'd been experiencing "stabbing and burning" leg pain which had increased gradually to a severity of "9" out of ten. *Id*. At times, her feet and hands felt numb and tingled. *Id*. Barnett indicated that her pain worsened with standing, walking, bending, and climbing and descending stairs. *Id*. Gabapentin or a hot bath improved Barnett's pain. *Id*. Previous attempts at pain relief using relaxation and topical creams were unsuccessful. *Id*.

Clinker found that Barnett had a guarded range of motion with moderate pain in her back during flexion, extension, and rotation. Tr. 410. She recorded tenderness with extension, compression, and direct palpitation bilaterally along the facets[7] of Barnett's lumbar region. *Id*. She noted that Barnett had poor posture. *Id*. Clinker found that Barnett had an antalgic gait[8] but also described Barnett's gait as "steady." *Id*. Various tests for persistent sacroiliac, lumbar, and hip pain showed positive results on Barnett's right side and less pronounced results on her left.[9] Tr. 410. Clinker determined that

---

[7]    The facets are the joints that connect the bones of the spine. *Facet Joint Syndrome*, Cedars Sinai Health Library, https://www.cedars-sinai.org/health-library/diseases-and-conditions/f/facet-joint-syndrome.html [https://perma.cc/2EVW-X97W].

[8]    An antalgic gait is a disrupted walking pattern usually due to pain avoidance. *Antalgic Gait*, Healthline Library of Health Conditions, https://www.healthline.com/health/antalgic-gait [https://perma.cc/H3DT-9VUV].

[9]    Clinker conducted a cluster of orthopedic tests—FABER, Compression, Sacral Thrust, and Distraction—each of which aims to provoke the sacroiliac joint. *See* Tr. 410; *see also Sacroiliac Compression Test*, Physiopedia,

Barnett's pain originated in her lumbar spine, extended into her thighs, and ended above her knees. *Id*. Clinker observed no motor weakness or lower extremity swelling. *See id*. Clinker found Barnett cooperative, alert, well-oriented, and appropriately behaved. *Id*. She noted that Barnett was able to answer questions without difficulty or hesitation. *Id*. She developed an at-home exercise program to strengthen Barnett's core and indicated that a stronger core would offer Barnett's spine better support. *Id*. Clinker also recommended videos on correcting posture, fixing rounded shoulders, and addressing lower back pain. *See* Tr. 411.

In early September 2020, Barnett returned to Avita for a follow-up with rheumatologist David G. Stainbrook, D.O. Tr. 447. Barnett reported fatigue, arthralgia, back pain, migraines, and neck pain and stiffness. *Id*. Dr. Stainbrook found intact motor function, coordination, reflexes, and gait. Tr. 450. He noted that Barnett was alert and oriented with a normal mood, affect, behavior, thought content, and judgment. *Id*. She had a "decreased range of motion, tenderness, and bony tenderness" in her shoulders. Tr. 448. Range of motion was limited in her hands, wrists, hips, knees, left ankle, feet, and cervical and lumbar regions. Tr. 448–49. Her right hip, upper arms, and

---

https://www.physiotutors.com/wiki/sacroiliac-compression-test/ [https://perma.cc/7TEE-KGBP]. The reproduction of persistent pain can help identify a musculoskeletal cause such as hip, lumbar spine, or sacroiliac joint dysfunction. *FABER Test*, Physiopedia, https://www.physiopedia.com/FABER_Test?utm_source=physiopedia&utm_medium=search&utm_campaign=ongoing_internal [https://perma.cc/A56G-HRN8].

cervical and thoracic regions were tender. Tr. 448. In Barnett's shoulders, Dr. Stainbrook diagnosed chronic pain, bursitis, and tendonitis. Tr. 451. He also diagnosed Barnett with cervicalgia, osteoarthritis in her hands and feet, tendonitis in her right hip and both biceps, and diabetic polyneuropathy. Tr. 451. Dr. Stainbrook ordered lab tests and x-rays, prescribed physical therapy and Sulindac,[10] and noted that Barnett had an elevated blood glucose level. Tr. 452. Barnett agreed to follow-up with her primary care provider regarding her high blood sugar. *See* Tr. 452.

The next day, Barnett saw Murphy in-person at Center Street. Tr. 602–04. Barnett was crying and explained to Murphy that she was dealing with the responsibility of deciding whether to continue life support for a loved one. Tr. 613. Murphy observed edema in Barnett's extremities and found Barnett's mood and affect inappropriate. *Id.*

In September 2020, Barnett transferred her pain management care to Adil Katabay, M.D., at BKC Pain Specialists. Tr. 414–21. Nurse practitioner Ashley Pensinger at BKC conducted Barnett's initial telehealth patient evaluation. Tr. 421. Barnett reported constant pain throughout her body that was more intense in her legs, shoulder, hip, and feet. Tr. 414. She described this pain as aching, shooting, "pins and needles," stabbing, and burning. *Id.*

---

[10]     Sulindac is a nonsteroidal anti-inflammatory medication used to treat mild to moderate pain and arthritis symptoms. *Sulindac*, Mayo Clinic Drugs and Supplements Library, https://www.mayoclinic.org/drugs-supplements/sulindac-oral-route/description/drg-20069763 [https://perma.cc/W8QF-7S4J].

Barnett rated her pain at a severity of "9" out of ten and indicated that it had started slowly and was getting worse. Tr. 414–15. She said that previous attempts to manage her pain by taking gabapentin, Vicodin, and oxycodone were unsuccessful. *Id*.

Pensinger found that Barnett was alert and well-oriented with clear speech and "good thought processing." Tr. 419. She determined that Barnett had an altered gait, pain in her shoulders with range of motion, radiating lumbar back pain, trigger point tenderness with palpitation of the cervical spine, and right hip pain that increased with weight bearing and range of motion. *Id*. Pensinger assessed Barnett with chronic pain syndrome, cervicothoracic radiculopathy, and right hip pain. Tr. 420. She recorded Barnett's interest in injection therapy and prescribed an opioid, a muscle relaxant, and a numbing cream. *See* Tr. 421.

During appointments in mid-September and October, Murphy noted that Barnett no longer had swelling in her arms or legs. Tr. 568, 612.  *See* Tr. 568, 612. She found that Barnett's memory, sensory system, orientation, mood, and affect were normal. Tr. 568, 612. In October, Barnett was depressed and attributed this to the recent death of a loved one. *See* Tr. 612.

Five days after Barnett's October appointment at Center Street, she had a telehealth follow-up with nurse practitioner Audrey Blount at BKC. Tr. 422–31. Barnett's physical exam results were the same as they had been in

September. Tr. 424–25. Blount continued Barnett's medications and suggested that Barnett could use a TENS unit to further reduce her pain.[11] Tr. 426.

In November 2020, Barnett saw Murphy for an in-person follow-up at Center Street. Tr. 589. Barnett reported anxiety and depression symptoms that were making it hard for her to concentrate and causing her to "lash[] out" at others. *Id*. She reported fatigue, a decreased need for sleep, difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, feeling down, feeling depressed or hopeless, and excessive worry. Tr. 589, 592.

Barnett next saw Murphy in January 2021. Tr. 587. Barnett's exam was normal. Tr. 564. Murphy did not find any edema or memory impairment. *Id*. She added Abilify to Barnett's medication regimen. *Id*.

In February 2021, Barnett had a telehealth follow-up with Blount at BKC. Tr. 538–57. Barnett reported mid-back pain, radiating right hip pain, and radiating right shoulder pain. Tr. 538. Blount recorded that Barnett's pain was tolerable and controlled by medication. *See* Tr. 555.

Barnett saw Murphy at Center Stret in March, April, and June 2021. Tr. 569, 571, 577. Except for routine, temporary concerns like "coarse breathing," a respiratory infection, and a skin rash, Barnett's exams were normal. *See, e.g.*, Tr. 565, 575, 585.

---

[11]    TENS is an abbreviation for transcutaneous electrical nerve stimulation. *Transcutaneous Electrical Nerve Stimulation*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens [https://perma.cc/5ZW8-MH9J].

In April, Barnett had two appointments in quick succession at BKC. Tr. 519–31. First, Dr. Katabay gave Barnett an epidural steroid injection in her lumbar region. Tr. 530–31. One week later, Barnett had a telehealth follow-up with Blount. Tr. 518. Blount noted Barnett's altered gait, cervical radicular pain, bilateral shoulder pain with range of motion, bilateral cervical facet tenderness and positive facet loading. Tr. 518–19. Barnett told Blount that the injections provided mild improvement and, more specifically, reduced a tingling sensation in her legs. Tr. 519. Blount recorded that Barnett's pain was tolerable and controlled by medication. Tr. 519. She recorded Barnett's interest in a second round of injections. *Id.*

Barnett next had a telehealth follow-up with Blount in June. Tr. 512. Blount recorded that Barnett's pain was tolerable and controlled by medication. Tr. 512–13.

In July 2021, Barnett saw Murphy at Center Street. Tr. 563, 576, 583. Barnett reported that for two weeks, she had been experiencing numbness on the side of her right foot. Tr. 563. Murphy conducted a monofilament examination.[12] Tr. 576. The results were abnormal and showed lateral

---

[12]     A provider conducting a monofilament test brushes a soft strand of nylon over the foot and toes to check for  loss of feeling. *See Monofilament Exam*, MedlinePlus, Medical Encyclopedia, https://medlineplus.gov/ency/ imagepages/19960.htm [https://perma.cc/4PNE-RDB8]; *Diabetic Foot Exam*, MedlinePlus, https://medlineplus.gov/lab-tests/diabetic-foot-exam/ [https://perma.cc/FLR9-55Y5].

numbness in both of Barnett's feet.[13] *Id.* Murphy found that Barnett had a normal pulse in her dorsalis pedis artery[14] and no edema. *Id.* Barnett said that she wanted to discuss insulin therapy options and diet. *Id.* She had an otherwise unremarkable exam. *Id.*

Barnett had a telehealth follow-up with nurse practitioner Ashley Thames at BKC in August 2021. Tr. 509. Thames described Barnett's pain as "well-managed with medication" and noted that "no procedures were required" at that time. *Id.*

Dr. Katabay administered a second round of lumbar injection therapy in September 2021. Tr. 527. Barnett "tolerated the procedure well." Tr. 530.

### 3. Function reports

In May 2020, Barnett completed a function report. Tr. 240–47. Barnett said that her illness, injuries, and conditions limited her ability to work

---

[13] The abnormal monofilament examination findings are a large part of Barnett's additional-evidence argument and her second assignment of error. *See* Doc. 8, at 17. There is, however, a discrepancy as to the date of the exam. Barnett cites page 576 of the transcript and says that the exam occurred on April 28, 2021. *See* Doc. 8, at 5 (citing Tr. 576). The Commissioner cites July 21, 2021 as the date of the exam. *See* Doc. 9, at 6. The date at the bottom of page 576 supports the Commissioner's interpretation of the date. As a result, I have determined that the exam with abnormal results took place in July 2021. *See* Tr. 563, 576, 583. Notably, the exam and its results are contained in Center Street records under Exhibit 9F. *See* Tr. 563, 576, 583. As discussed, Center Street submitted these records without chronological or narrative order. *See, e.g.*, Tr. 562–614.

[14] The dorsalis pedis artery is the principal artery on the dorsal surface, or top, of the foot. *Dorsalis Pedis Artery*, Physiopedia, https://www.physio-pedia.com/Dorsalis_Pedis_Artery [https://perma.cc/DDL4-VPPH].

because they restricted the length of time she could stand or walk. Tr. 240. She said that she felt tired, lacked energy, and her whole body ached. *Id*. Barnett described what she did from the time she woke up until she went to bed as "[n]ot much of anything[,] mostly lay around." Tr. 241. She indicated that her legs hurt during the night and that pain in her hips disrupted her sleep. *Id*.

Barnett said that she didn't handle stress well "at all" and that she had a fear of "being around a lot of people." Tr. 246. She reported problems getting along with family, friends, neighbors, and others. Tr. 245. She explained that she was "always upset and depressed and aggravated" and that she cried and became upset easily. *Id*. She reported getting along "OK" with authority figures and said that she had never been fired from a job. Tr. 246. She rated her ability to follow written and spoken instructions as "good." Tr. 245. She said that she was able to prepare her own meals with help from her children. Tr. 242.

### 4. *State agency and other medical opinion evidence.*[15]

In July 2020, initial state agency consulting physician W. Scott Bolz, M.D., reviewed the medical evidence. Tr. 72–89. He found that despite several

---

[15]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

severe musculoskeletal and mental disorders, Barnett had the physical residual functional capacity (RFC)[16] to perform unskilled, light work with additional limitations. *See* Tr. 74, 79. Dr. Bolz opined that Barnett was unlimited in her ability to push and pull with her arms or her legs. Tr. 76. She could lift or carry 20 pounds occasionally and 10 pounds frequently. *Id*. She could occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. *Id*. Barnett could occasionally balance, stoop, kneel, crouch, and crawl. *Id*. According to Dr. Bolz, she would be able to stand, walk, or sit for a total of about six hours in an eight-hour workday. *Id*. Barnett had no manipulative, visual, communicative or environmental limitations. Tr. 77. In March 2021, on reconsideration, state agency consulting physician Gerald Klyop, M.D., reviewed the evidence and endorsed Dr. Bolz's findings. Tr. 105–06, 108.

In December 2020, consultative examiner Taylor Groneck, Ph.D., conducted a telehealth psychological evaluation. Tr. 440–45. Barnett told Dr. Groneck that she had "very bad anxiety and depression issues." Tr. 440. She "c[ould]n't stay on one thing very long." *Id*. She became aggravated and upset easily. *Id*. She had "outbursts" and screamed at her kids. *Id*. Barnett described her typical mood as "very moody, edgy, and irritable." Tr. 441.

---

[16]     An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Dr. Groneck noted that Barnett was not receiving mental health treatment. *Id*. Despite this, Dr. Groneck noted, Barnett said that she had a low mood and was irritable every day. Tr. 441–42. Barnett reported depression symptoms such as disrupted sleep, decreased appetite, low energy, no motivation, and a lack of interest in previously pleasurable activities. Tr. 442. She reported anxiety symptoms such as increased heart rate, perspiration, and shortness of breath when she was "around a bunch of people[,] … [l]ike at the grocery store." Tr. 442. Barnett said that she had been experiencing these symptoms of anxiety and depression for about a year. *Id*. Barnett denied any history of psychiatric hospitalization. Tr. 441. She denied current or past suicidal or homicidal thoughts and denied a family history of mental illness, alcoholism, or substance abuse. *Id*. Barnett was twice married and divorced. *Id*. She had six children, two of whom were teenagers at the time of the evaluation while the rest were adults. *Id*.

Barnett discussed her scholastic and vocational history with Dr. Groneck. Tr. 441–42. She denied any learning, disciplinary, or behavior problems in school. Tr. 441. She participated in extracurricular activities and sports and related well to others despite being quiet and shy. *Id*. Barnett denied ever receiving any disciplinary action at work. Tr. 442. She said she had never been fired from a job or had problems learning or remembering things at work. *Id*. In her most recent job as a grocery store cashier, Barnett reported that her leg swelling made it difficult for her to stand and walk during her

15

shift, however, she did not have any disciplinary, social, or learning problems while she had that job. *Id.*

Dr. Groneck found that Barnett was "quietly cooperative," alert, and well-oriented. Tr. 443. Noting that she could recall four digits forward and three backward, Dr. Groneck found that Barnett had poor short-term and working memory abilities. *Id.* Observing that she needed questions repeated on a few occasions, Dr. Groneck found that Barnett had limited attention and concentration abilities. *Id.* Dr. Groneck noted Barnett's tendency to "give up easily on the more challenging tasks" even though she had adequate mathematical skills and appeared to be of average intelligence. Tr. 443–44. Dr. Groneck found that Barnett had normal, reactive facial expressions, though her affect was dysphoric.[17] Tr. 443. Barnett appeared to be depressed and was tearful at times. *Id.* Dr. Groneck diagnosed Barnett with "moderate major depressive disorder, recurrent" and panic disorder with agoraphobia. Tr. 444.

Dr. Groneck assessed Barnett's abilities and limitations under the four broad areas of mental functioning: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Tr. 444–45. As to the ability to understand, remember, and carry out instructions, Dr. Groneck found that Barnett "may have a hard time retaining complex and multi-step information" due to her depression. Tr. 444. As to the ability to

---

[17]    A dysphoric mood or affect is characterized by disquiet, restlessness, or malaise. *See* Dorland's Illustrated Medical Dictionary 573 (33rd ed. 2020).

sustain sufficient concentration and persistence to perform simple and multi-step tasks, Dr. Groneck found that Barnett's preoccupation with depressive symptoms would likely "impact her concentration, persistence, and pace in the work setting." Tr. 445. As to the ability to interact socially, Dr. Groneck found that Barnett "may struggle in customer service oriented positions … [and] have a difficult time functioning in crowded spaces." *Id*. As to the ability to adapt to work pressures in a work setting, Dr. Groneck found that Barnett "appear[ed] capable of adjusting to few minor workplace pressures due to depressive symptoms" and may respond by displaying "increased tearfulness, lethargy, and irritability." *Id*. Dr. Groneck opined that Barnett's tolerance for frustration was "probably poor" and that workplace pressure "might exacerbate [Barnett's] experience of pain." Tr. 445.

In January 2021, state agency consultative psychologist Jennifer Swain, Psy.D., reviewed the evidence. Tr. 74–75. Dr. Swain found that Barnett was moderately limited in each of the four broad areas of mental functioning. *See* Tr. 74. Dr. Swain found limitations in understanding and memory that restricted Barnett to "simple tasks." Tr. 77. She found limitations in sustained concentration and persistence that restricted Barnett to "routine tasks where social distractions [we]re limited and there [we]re no demands for a rapid pace." *Id*. Dr. Swain opined that limitations in social interaction restricted Barnett to tasks not involving close contact with others or requiring Barnett to resolve customer complaints. Tr. 78. Dr. Swain found limitations in adaptation

17

that restricted Barnett to duties which remained relatively static and changes that could easily be explained. *Id*. State agency consulting psychologist Courtney Zeune, Psy.D., reviewed the evidence on reconsideration in March 2021 and endorsed Dr. Swain's findings. Tr. 97–98.

### 5. Testimonial evidence

Barnett and a vocational expert testified during the hearing in November 2021. Tr. 39–69. Barnett was represented by attorney Michael DeMaria. Tr. 39. One month earlier, co-counsel Thomas A. Klint submitted a pre-hearing brief advocating that the ALJ find Jones disabled. *See* Tr. 290–94. At the hearing, DeMaria asked the ALJ to incorporate Klint's pre-hearing brief as DeMaria's opening statement then summarized Klint's arguments. Tr. 46. Barnett then testified. Tr. 46–59.

Barnett discussed her physical health and abilities. Tr. 47–55. She said that she mostly slept during the day. Tr. 49. She had no energy and even taking a bath wore her out. *Id*. Barnett's feet swelled if she stood for more than 15 to 20 minutes. Tr. 55. When she did household tasks like washing the dishes or cooking a meal, she would stand for about 20 minutes then take a break, then stand for 20 minutes again until she completed the task. *See id*. Barnett handled her own self-care. *Id*. She did laundry, albeit rarely, as long as her children carried the laundry baskets up and down the stairs. Tr. 54. Barnett prepared her own meals. Tr. 55. She could do her own shopping and when she did, she used a seated cart. *See id*. Barnett wasn't able to bend at the waist,

18

reach overhead, or pick up an item from the floor if she didn't have an object nearby that she could use to get back up again. Tr. 58. Barnett said that she had "[s]ome … good days and … sometimes really bad days." Tr. 55. She took medication for diabetes, high cholesterol, heartburn, hepatitis, arthritis, an autoimmune disease, and pain. Tr. 56–57.

Barnett discussed her mental health symptoms due to depression, anxiety, and panic disorder. Tr. 58. Barnett cried easily "for no reason." Tr. 59. She wasn't able focus long enough to finish one task before moving on to another. *Id.*  Within 20 minutes of placing her belongings somewhere, Barnett would forget where she had put them. *Id.* She had trouble remembering the things that her children told her. *Id.* Barnett said that around unfamiliar people, she had panic attacks. *Id.* For example, Barnett explained, if she was in a store with a group of people that she didn't know, she would "start crying[,] … freak out[,] … and just want to get out of the store." Tr. 59. She took multiple medications for anxiety and depression. Tr. 56–57.

After Barnett, vocational expert Mona Robinson testified. Tr. 59–68. According to Robinson, a hypothetical individual with the same age, education, and work experience as Barnett and with the limitations assessed in Barnett's RFC, described below, could perform Barnett's past work as a driver unloading cars from a train. Tr. 62, 66–67; *see also* Tr. 54. Robinson testified that such an individual could also perform unskilled light labor such as a mail sorter, garment sorter, or a marker. Tr. 66. In response to questioning by DeMaria,

19

Robinson confirmed that a limitation to sedentary work would preclude the hypothetical individual from performing Barnett's past relevant work. Tr. 67. Being off task for more than 20 percent of the work day or absent in excess of two days per month would also be work preclusive. Tr. 63–64.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2022.

2. The claimant has not engaged in substantial gainful activity since January 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3. The claimant has the following severe impairments: major depressive disorder; panic disorder with agoraphobia; diabetes with neuropathy; chronic pain syndrome; lumbar facet arthropathy (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently. She is able to push and pull the same amount as lift and carry. Stand and/or walk about six hours in an

eight-hour day and sit about six hours in an eight-hour day. Occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. Occasionally stoop, kneel, crouch, and crawl. She would be able to perform simple routine tasks that do not require a fast production rate pace. She would be able to interact with coworkers where there is occasional interaction with coworkers and supervisors but no tandem or shared tasks or tasks done in collaboration with coworkers and no over-the-shoulder supervision. She could have occasional interaction with the public but not in a customer service capacity. She would be able adapt to a relatively static work environment where changes can be easily explained.

6. The claimant is capable of performing past relevant work as a driver. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant was born [in March] 1967 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 416.964).

9. Transferability of job skills is not an issue because the claimant's past relevant work is unskilled (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2018, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 20–33.

### Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court ... asks whether" the "existing administrative record ... contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings ... as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.

2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

*1. Whether the ALJ properly evaluated Dr. Groneck's medical opinion evidence and accounted for her opinions in the RFC*

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion but "need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." 20 C.F.R. § 416.920c(b)(2); *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical

24

opinion." *Toennies v. Comm'r of Soc. Sec.*, No. 1:19-cv-226, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Barnett says that the ALJ did not adequately consider the supportability factor as she evaluated Dr. Groneck's report and opinions and thus the evaluation is flawed. Doc. 8, at 12. Barnett says that the ALJ was required to adopt Dr. Groneck's opinions regarding the degrees to which Barnett's impairments would limit her ability to respond to work pressure in a work setting and claims that the ALJ did not provide a sufficient rationale for discounting this aspect of Dr. Groneck's opinion. Doc. 8, at 8–11. Barnett says that the ALJ overlooked Dr. Groneck's findings that supported a more restrictive limitation, such dysphoric affect, tearfulness, variable eye contact, low energy, "poor" short-term and working memory, and a tendency to give up easily when faced with a challenging task. *Id* at 12–13; *see* Tr. 443, 445. This argument, however, disregards the rest of the ALJ's decision. Tr. 30. As more fully explained below, Barnett's challenges to the evaluation of Dr. Groneck's medical opinion evidence fail for this and several other reasons.

First, as the Commissioner points out, the ALJ crafted an RFC that was consistent with Dr. Groneck's medical opinions. *See* Tr. 26–27; Doc. 9, at 1, 7–11. After the ALJ deemed Dr. Groneck's report "persuasive in support of some limitation in the broad areas of mental functioning," the ALJ made determinations principally consistent with those opinions. Tr. 30. She

25

explicitly stated that she had "incorporated limitations consistent with [Dr. Groneck's] opinion into the residual functional capacity, such as reducing complexity of tasks, reduced social functioning in nature and quantity of interactions and specifically customer service work, limited changes in a work setting, and reduced pace requirements." Tr. 30.

For example, Dr. Groneck opined that Barnett's depression limited her ability to understand, remember, and carry out instructions in that she "may have a hard time retaining complex and multi-step information." Tr. 444. In the RFC, the ALJ limited Barnett to simple, routine tasks. Tr. 26. Dr. Groneck opined that Barnett's preoccupation with her symptoms would likely affect "her concentration, persistence, and pace in the work setting." Tr. 444–45. In the RFC, the ALJ limited Barnett to simple tasks that did not require a fast pace and which could be completed in a relatively static work environment. Tr. 26–27. Dr. Groneck opined that Barnett's social interaction abilities were limited in that she "may struggle in customer service oriented positions … [and] have a difficult time functioning in crowded spaces." Tr. 445. In the RFC, the ALJ restricted Barnett to no more than occasional interaction with the public and indicated that this occasional interaction could not be in customer service. Tr. 27. Dr. Groneck opined that Barnett's ability to adapt to workplace pressure was limited in that she could handle very little pressure, which could only be minor in nature. Tr. 445. Dr. Groneck opined that Barnett would likely respond to workplace stress with tears, irritation, or exhaustion, and would

"probably poor[ly]" tolerate frustration. *See id*. In the RFC, the ALJ limited Barnett to no more than occasional interaction with coworkers and supervisors and prohibited over-the-shoulder supervision and tandem, collaborative, or shared tasks. Tr. 26. The ALJ also limited Barnett to work that did not require a production-rate pace. Tr. 26. Barnett needed a relatively static workplace in which all necessary changes could be easily explained. Tr. 26–27.

Moreover, as the Commissioner notes, the ALJ cited Dr. Groneck's clinical findings throughout her explanation of her rationale for the mental RFC. *See*, *e.g.*, Tr. 26, 30. Barnett neither acknowledges nor challenges these findings. Doc. 9, at 10. Barnett also doesn't cite any direct inconsistencies between Dr. Groneck's opinions and the RFC.

Second, contrary to Barnett's claims, although the ALJ largely followed Groneck's opinion, she explained why she did not fully follow it. *See* Tr. 30. The ALJ found Dr. Groneck's report and opinions persuasive and supportive of limitations in each of the broad areas of mental functioning. Tr. 30. As discussed, the ALJ adopted many of those opinions. *See* Tr. 26–27, 444–45. The ALJ also found, however, that Dr. Groneck's report and opinions, which relied in large part on Barnett's self-reported symptoms and history, "tend[ed] to overstate the claimant's limitations in light of the evidence as a whole." Tr. 30. The ALJ found that Dr. Groneck's "degree[s] of impairment [were] not consistent with nor supported by the evidence." Tr. 30.

27

For example, during the evaluation, Barnett claimed to have medical conditions that were not documented in the medical record. Tr. 30. These included "debilitating [leg] pain" that "at times require[ed her to use] a wheelchair" and "very bad anxiety and depression," which the ALJ found were not entirely consistent with Murphy's treatment notes. *Id*. The ALJ noted that the record "generally document[ed] no substantial, ongoing mental symptoms." Tr. 30. The ALJ highlighted the fact that Barnett required no more than conservative treatment from her primary care provider. *Id*; *see, e.g.*, *Kevin A. v. Comm'r of Soc. Sec.*, No. 1:22-cv-307, 2023 WL 4545164, at *7 (S.D. Ohio July 14, 2023) ("the ALJ reasonably considered plaintiff's failure to seek mental health treatment beyond prescription medication in determining whether the consultants' opinions were consistent with other medical and nonmedical evidence."). The ALJ noted that Barnett did not receive any specialized mental health treatment "despite report[ing] symptoms such as panic attacks, irritability, and depression … [and] alleg[ing] difficulty … in groups or crowds due to anxiety as well as low mood and irritability." Tr. 30. The ALJ noted that anxiety was not recorded during many of Barnett's mental status examinations. *See id*; *see also* Tr. 55. She considered Barnett's ability to shop in stores despite her claims of panic and anxiety. Tr. 30. The ALJ mentioned Dr. Groneck's classification of Barnett's major depressive disorder as "moderate" and expressed skepticism that a moderate form of the disorder could cause the disabling-level limitations Dr. Groneck suggested in her report

and opinions. *Id*. The ALJ found less persuasive these aspects of Dr. Groneck's report and discounted Dr. Groneck's opinions as to the degree of Barnett's impairments due to anxiety, depression, and memory issues. *Id*.

Third, as the Commissioner notes, the ALJ found persuasive the "competing prior administrative findings" of state agency consulting psychologists Doctors Swain and Zeune. Doc. 9, at 9; *see* Tr. 31, 77–78, 97–99. These findings provided substantial evidence in support of the ALJ's conclusion that Dr. Groneck was prone to overstating Barnett's limitations, specifically with respect to workplace pressure, as compared to the rest of the objective medical evidence. *See* Tr. 31 (citing Tr. 77–78, 97–98, 444–45); *see also, e.g., Moats v. Comm'r of Soc. Sec. Admin.*, No. 3:20-cv-00265, 2021 WL 2905079, at *17 (N.D. Ohio Jan. 8, 2021) (holding that a prior consultative psychological examiner's opinion was substantial evidence), *report and recommendation adopted* 2021 WL 2216804 (N.D. Ohio June 2, 2021), *aff'd*, 42 F.4th 558 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 785 (2023).

For example, each of the consultative psychologists—Groneck, Swain, and Zeune—opined that Barnett had limitations in all four areas of mental functioning: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. *See* Tr. 77–78, 97–98, 444–45. And the RFC has limitations in each of those functional areas. *See* Tr. 26–27.

With respect to understanding and memory limitations, Dr. Groneck found intellectual abilities consistent with functioning in the average range of

intelligence and observed that Barnett was able to understand all of the simple questions during her psychological examination. Tr. 444. She indicated that Barnett "may struggle to retain complex and multi-step information." *Id*. Doctors Swain and Zeune found Barnett no more than moderately limited in the ability to understand and remember detailed instructions and recommended a limitation to simple tasks. Tr. 77, 97. In the RFC, the ALJ restricted Barnett to "simple routine tasks." Tr. 26.

As to sustained concentration and persistence limitations, Dr. Groneck attributed Barnett's losing focus during the examination to her preoccupation with her depressive symptoms and opined that she would similarly struggle to concentrate, persist, and maintain pace vocationally. *Id*. Doctors Swain and Zeune, however, found Barnett no more than moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 77, 97. They recommended a limitation to routine tasks where social distractions were limited and there were no demands for a rapid pace. Tr. 77, 97. In the RFC, the ALJ limited Barnett to "tasks that do not require a fast production rate pace." Tr. 26.

In the domain of social interaction, Dr. Groneck found that, based on Barnett's self-reports of irritability at home, agitation with others, and "lash[ing] out verbally," Barnett "may struggle in a customer service oriented position." Tr. 445. She further opined that "due to [Barnett's] panic attack symptoms, she w[ould] have a difficult time functioning in crowded spaces." Tr. 445. Doctors Swain and Zeune found that Barnett was no more than moderately limited in the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 78, 97–98. They recommended a limitation to tasks that did not involve close contact with others or require Barnett to resolve customer complaints. Tr. 78, 97–98. The ALJ determined in the RFC that Barnett could tolerate "occasional interaction with coworkers and supervisors but no tandem or shared tasks or tasks done in collaboration with coworkers and no over-the-shoulder supervision." Tr. 26–27. The RFC further limited Barnett to "occasional interaction with the public but not in a customer service capacity." Tr. 27.

Concerning adaptation, Dr. Groneck began by noting that "Barnett had been diagnosed with depression and panic disorder" before opining that she:

> appear[ed] to possess few coping skills for managing her symptoms, as evidenced by irritability and tearfulness during the examination. She adjusted poorly to the demands of the clinical interview. She appear[ed] capable of adjusting to few minor workplace pressures due to depressive symptoms. In

> response to workplace pressures she may display increased tearfulness, lethargy, and irritability. Her frustration tolerance is expected to be poor. Exposure to workplace pressures may also exacerbate her experience of pain.

Tr. 445. Dr. Groneck's opined level of impairment was inconsistent with the findings of Doctors Swain and Zeune. Tr. 78, 98. The state agency psychologists determined that Barnett was no more than moderately limited in the ability to respond appropriately to changes in the work setting. Tr. 78, 98. They suggested limiting her to tasks in which the work duties would remain relatively static and any changes could be easily explained. Tr. 78, 98. In the RFC, the ALJ adopted the "persuasive" state agency findings and determined that Barnett was "able adapt to a relatively static work environment where changes c[ould] be easily explained." Tr. 27.

As illustrated above, Dr. Groneck's opinions are largely consistent with the prior administrative findings of the state agency consulting psychologists. *See* Tr. 77–78, 97–99, 444–45. The notable exception is Dr. Groneck's more significant limitation as to Barnett's capacity for work pressure in a work setting. Tr. 78, 98, 445. When the record, is considered as a whole, it's clear that that substantial evidence supports the ALJ's findings with respect to adaptation and self-management. *See* Tr. 26–27, 30. The ALJ's other mental RFC findings—those addressing task complexity, customer service, and pace— are similarly supported and consistent with the ALJ's express intention to account for Dr. Groneck's opinions in the RFC. *See* Tr. 26–27, 30.

The fourth reason that Barnett's argument fails is that the Sixth Circuit has repeatedly held that the ALJ, not a physician, is responsible for assessing a claimant's RFC. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see* 20 C.F.R. § 404.1546(c). When determining an RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding ... [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id*. And, "[e]ven where an ALJ provides 'great weight' to an opinion," there is no requirement that an ALJ adopt a consultative medical opinion "verbatim" or adopt its "limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Furthermore, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's medical opinion. *See Smith v. Comm'r of Soc. Sec.*, No. 5:11-cv-2104, 2013 WL 1150133, *11 (N.D. Ohio Mar. 19, 2013), *aff'd*, No. 13-3578 (6th Cir. Jan. 30, 2014). So once the ALJ found less persuasive Dr. Groneck's opined degrees of limitation due to anxiety, depression, and panic disorder, and once she adequately explained her rationale for this finding, the ALJ was under no obligation to fully incorporate Dr. Groneck's opined limitations in the RFC.

Barnett criticizes the ALJ for finding "an internal discrepancy between Dr. Groneck's diagnosis of 'moderate' major depressive disorder and 'disabling' depression." *See* Doc. 8, at 14 (citing Tr. 30). Perhaps the ALJ could have

provided a fuller explanation when she found that Barnett's "moderate major depressive disorder ... [was] not entirely consistent with disabling depression." Tr. 30. As Barnett says, just because a depressive disorder is deemed "moderate" doesn't mean that it couldn't significantly affect the ability to respond appropriately to work pressures in a work setting. *See id*, at 14.

Unfortunately for Barnett, her—semantic—quibble on this issue is overshadowed by a bigger obstacle with respect to her depressive disorder and the ability to adapt. Barnett's argument overlooks the scant objective medical evidence to support the severity of Barnett's depressive disorder in the first place, moderate or otherwise. *See* Tr. 30 (noting this lack of evidence). And it's the claimant's burden to establish his or her impairments and their severity. *See Thacker*, 93 F. App'x at 727–28 (6th Cir. 2004); *see also Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). As the ALJ noted, Barnett has no documented evidence of treatment for depression by a mental health specialist during the relevant time period and no history of psychiatric hospitalizations. *See* Tr. 30.

In addition, as the Commissioner says, the ALJ relied on more than Dr. Groneck's moderate classification in finding that Dr. Groneck's opinions tended to "overstate" the likely effect of Barnett's mental health on her ability to adapt and manage pressure at work. *See* Doc. 9, at 10. The ALJ cited Barnett's lack of specialized mental health treatment, the prevalence of normal memory and cognitive findings in the objective medical record, and the prior

34

administrative findings of Doctors Swain and Zeune. *See* Tr. 30. And, Barnett hasn't provided any support for her assertion that it is error for an ALJ to find a portion of a medical opinion less persuasive due to a discrepancy between an expert's diagnosis of a moderate disorder and the expert's opinion that the moderate disorder would disable an area of mental functioning.

Barnett also appears to argue that if the ALJ had fully considered the supportability of Dr. Groneck's opinion, she would have adopted Dr. Groneck's findings in full.[18] Doc. 8, at 14. Barnett then asserts that if the ALJ had adopted Dr. Groneck's findings in full, she would have found Barnett likely to be off task 20 percent of the workday. *See id.* at 14. Barnett concludes that due to this daily off-task percentage "a finding that Plaintiff cannot meet the mental demands of even unskilled work would be warranted" according to the testimony of vocational expert Robinson. *See* Doc. 8, at 14; *see also* Tr. 67.

---

[18]     In her brief, Barnett says:

> Recall that Dr. Groneck found that, even with unskilled work, Plaintiff would have difficulty coping, … poor frustration tolerance, and … not be able to respond appropriately to work pressures in a work setting. Tr. 445. Further, the VE testified that being off task 20 percent of the day would be work-preclusive. Tr. 67. Thus, had Dr. Groneck's opinion been properly considered and credited as true, a finding that Plaintiff cannot meet the mental demands of even unskilled work would be warranted.

Doc. 8, at 14.

This argument has two major problems.

First, it lacks a factual basis. In his report, Dr. Groneck never opined about any anticipated off-task time and didn't find that Barnett would likely be off task 20 percent of each workday. *See* Tr. 440–45. So Barnett's argument is based on speculation. And Barnett doesn't provide any reason or authority to explain why she believes her leaps in logic should be credited or adopted. *See* Doc. 8, at 14. Second, it ignores the standard of review and invites this Court to reweigh the evidence, which it cannot do. *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020). Even if what Barnett says were true, and a finding the opposite of that reached by the ALJ might have been warranted, Barnett hasn't shown that the ALJ's finding lacked substantial support in the record.

So the ALJ adequately assessed Dr. Groneck's opinions and discussed the factors of supportability and consistency directly and indirectly. *See, e.g.,* Tr. 25 (discussing the mental status exam findings of Murphy, Clinker, Blount, and Thames), 26 (discussing Dr. Groneck's findings and Barnett's statements in her function report), 30 (discussing Barnett's claims during Dr. Groneck's examination as compared to other evidence in the objective medical record). The discussion of Dr. Groneck's medical opinions as compared to the rest of the objective medical evidence and the discussion of the internal consistency of Dr. Groneck's facts and medical opinions are relevant to the supportability of Dr. Groneck's medical opinion evidence. *See* 20 C.F.R. § 416.920c(c)(1) (defining

36

supportability as whether the objective medical evidence and supporting explanations by a medical source support that source's medical opinions). When the ALJ's decision is considered as a whole, the facts found in the medical evidence support the ALJ's finding generally persuasive Dr. Groneck's opinions. *See* Tr. 30. Additionally, the ALJ's assessment of Dr. Groneck's opinions demonstrates internal support with the exception of the portions of Dr. Groneck's opinions that the ALJ found less persuasive. *See id*. As such, Barnett's claim that the ALJ did not adequately consider the supportability of Dr. Groneck's medical opinion evidence, Doc. 8, at 11–14, fails. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (an ALJ's decision should be "viewed as a whole"); *cf. Cormany*, 2022 WL 4115232, at *5 ("Although the ALJ did not use the words 'supportability' and 'consistency' in the decision, this omission does not necessarily mean that the ALJ did not consider these factors.... To the contrary, reading the decision as a whole, the Court finds that the ALJ considered both the supportability and consistency of Dr. Iler's opinion").

2. *Whether substantial evidence supports the physical RFC*

Barnett's second issue involves treatment notes from a July 2021 Center Street appointment during which Murphy conducted a monofilament exam with abnormal results. *See* Doc. 8, at 16–17; *see also* Tr. 563. Barnett reported that for two weeks, she'd been experiencing numbness in the side of her right foot. Tr. 563. Murphy conducted the monofilament examination and found

lateral numbness in both of Barnett's feet. *Id*. Barnett's physical exam was otherwise normal. *Id*.

Barnett submitted these treatment records after the medical experts reviewed the evidence and submitted their opinions. *See* Doc. 8, at 16–17; Tr. 34. Barnett argues that the ALJ wasn't qualified to interpret the monofilament test results and said that the record required them to be analyzed by a medical expert. *See* Doc. 8, at 17. Barnett claims that the ALJ had an obligation to develop the record further and obtain such an analysis. Doc. 8, at 17. She says that sufficient evidence does not support the ALJ's RFC because instead of meeting this obligation, the ALJ improperly assessed the exam results alone and crafted an RFC without necessary expert guidance. *See* Doc. 8, at 18.

The most immediate problem with Barnett's argument is that an ALJ can formulate an RFC without a medical opinion. *See Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding"); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015) (affirming that "neither the applicable regulations nor Sixth Circuit law limit the ALJ to consideration of direct medical opinions on the issue of RFC" and, moreover "none of the[] cases [cited by the claimant] even remotely suggests that an ALJ must, as a matter of law, seek out a physician's medical opinion where one is not offered."); *Rudd v.*

38

*Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the plaintiff's argument that the ALJ is required "to base her RFC finding on a physician's opinion").

Another hurdle for Barnett is that the rule on which her duty-to-develop-the-record argument relies does not enjoy the support of binding legal precedent. Barnett cites *Phelps v. Comm'r of Soc. Sec. Admin.*, No. 1:21-cv-2295, 2022 WL 18395824, at *8 (N.D. Ohio Nov. 15, 2022), *report and recommendation adopted* (N.D. Ohio Jan. 18, 2023) which, in turn, relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008) and its progeny. *See Phelps*, 2022 WL 18395824, at *9–10. In *Deskin*, the court held that:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

605 F. Supp. 2d at 912 (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). The *Deskin* court clarified its decision in *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011) to hold "that *Deskin potentially* applies in only two circumstances:

39

when an ALJ made an RFC determination based on no medical source opinion, or when an ALJ made an RFC based on an 'outdated' medical source opinion 'that [did] not include consideration of a critical body of objective medical evidence.'" *Phelps*, 2022 WL 18395824, at *9 (emphasis added); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20-cv-1655, 2021 WL 6881246, at *6 (N.D. Ohio Sept. 10, 2021). The Court clarified that "*Deskin* sets out a narrow rule that does not constitute a bright-line test." *Kizys*, 2011 WL 5024866, at *2. But *Deskin* isn't controlling, and it has received mixed reviews. *See Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023) ("*Deskin* … conflicts with the regulations and Sixth Circuit case law"); *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) ("The Court finds, however, that *Deskin* … is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals."); *see also Berrier*, 2021 WL 6881246, at *6 (citing cases that followed *Deskin* and those that did not), *report and recommendation adopted*, 2022 WL 189855 (N.D. Ohio Jan. 21, 2022).

The bottom line is that various courts apply various standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to prove her case rests on the claimant, not the ALJ. *See Moats*, 42 F.4th at 563; 20 C.F.R. § 404.1512(a). Further, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant her the authority

to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.917(a)); *see Winans*, 2023 WL 7622634, at *3–4 nn. 39–40, 42–43, 50 (citing *Landsaw*). While the ALJ has a duty to conduct a "full inquiry," that duty "does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw*, 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)); *see also* 20 C.F.R. § 416.919a(b)(1) (an ALJ may be required to obtain a consultative exam when "[t]he additional evidence needed is not contained in the records of [the claimant's] medical sources").

But even setting aside the absence of binding precedent and the lack of supporting legal authority, Barnett's argument fails.

The case that Barnett cites, *Phelps*, hinges on a completely different set of circumstances than the circumstances here. In *Phelps*, after the medical experts submitted their opinions, the claimant provided additional evidence containing "numerous examples of ongoing symptoms and diagnostic tests, including symptoms and diagnostic tests the ALJ insist[ed] [were] not in the record" as well as the *only* objective evidence of his upper extremity limitations. *Phelps*, 2022 WL 18395824, at *9. The ALJ in *Phelps* "inaccurate[ly] assess[ed] … the medical record" which was concerning in a situation where the ALJ was "the only one … review[ing] the relevant medical records." *See id*. For example,

the ALJ failed to acknowledge MRI test results in the claimant's additional evidence while making clear that she placed great weight on the record's lack of MRI testing when she rejected the claimant's alleged degrees of limitation due to his subjective symptoms. *See id*. Here, in contrast, the ALJ explicitly considered the July 2021 abnormal monofilament exam results, as Barnett notes. *See* Doc. 8, at 17 (citing Tr. 29–30). The ALJ further demonstrated a thorough command of Barnett's medical evidence. Tr. 29–30. She discussed the July 2021 monofilament exam results with a clear appreciation for the import of their deviation from the "intact sensation" findings of prior exams. *See* Tr. 29–30.

More importantly, the claimant in *Phelps* had an ample basis—notes from a novel treatment, assessment of a new injury, additional prescriptions, and clinical findings related to ongoing symptoms—to show that his additional records represented a critical body of objective medical evidence. *Phelps*, 2022 WL 18395824, at *9. Here, despite Barnett's assertions to the contrary, the record simply doesn't support the idea that the July 2021 monofilament exam results were a "critical body of objective medical evidence." *See* Doc. 8, at 18 (citing *Phelps*, 2022 WL 18395824, at *9). Even as Barnett makes this argument, she undercuts her position. She says the July 2021 monofilament exam results *confirmed* numbness in her feet, a fact that was already present in the record and previously available to the medical experts. *See* Doc. 8, at 17; *see also, e.g.*, Tr. 372–73 (treatment notes from July 2019 describing numbness,

tingling, and burning in her lower legs and feet); Tr. 378 (notes from January 2020 that recorded numbness and tingling in her legs and feet that made Barnett feel as if she were "walking on needles"); Tr. 407 (notes from an evaluation in June 2020 during which Barnett reported having numbness and tingling in her hands and feet "at times"); Tr. 414, 421 (listing "pins and needles" during a September 2020 assessment as one of the qualities of the constant pain that was more severe in Barnett's legs, feet, hips, and shoulder).

Barnett argues that the record was insufficient because it lacked an expert's assessment of the numbness in her feet. *See* Doc. 8, at 17–18. She says that "this is not a case where there is little physical impairment such that the ALJ can render a commonsense judgment about Plaintiff's functional capacity." Doc. 8, at 18. She cites the ALJ's findings at step two—that Barnett had severe physical impairments and that those impairments significantly limited her ability to work—to support this claim. *See id*, at 18 (citing Tr. 23). But the ALJ's step-two findings don't support Barnett's claim of a severe impairment of or involving the numbness in the feet. Tr. 23.

At step two, the ALJ found that Barnett had severe impairments including major depressive disorder, panic disorder with agoraphobia, diabetes with neuropathy, chronic pain syndrome, and lumbar facet arthropathy. Tr. 23. She found nonsevere impairments including carpal tunnel, mild osteoarthritic, hypertension, and obesity. Tr. 23–24. Barnett alleged a few conditions for which the ALJ found insufficient evidence to support a medically

determinable impairment such as a history of psoriasis and shoulder and neck pain. *See* Tr. 23 (citing Tr. 405–12). The only findings even plausibly related to "numbness in both feet" are found in the ALJ's discussion of obesity, which the ALJ found did not have a significant effect on Barnett's physical function or impair her "ability to stand, sit, walk, lift, or carry, … perform postural activities, [or] work around hazards." Tr. 23–24. The ALJ noted that Barnett "often ha[d] a normal gait without deficits." *Id*. So the ALJ's step two findings do not support a claim of an impairment due to numbness in the feet and they do not show that Barnett's numbness in her feet was a non-minimal impairment with potential effects that the ALJ wasn't qualified to determine. *See* Doc. 8, at 18; Tr. 23.

Barnett cites the RFC's limitation to "no more than light work" as additional support for her claim that the numbness in her feet was an impairment with potential effects that the ALJ could not determine alone. *See* Doc. 8, at 18 (citing Tr. 26). The light work limitation does not support Barnett's claim that the ALJ wasn't qualified to determine the potential limiting effects of Barnett's numbness in both feet and, in fact, the ALJ's explanation of the rationale for this limitation demonstrates just the opposite. *See* Tr. 29 (indicating that the preclusion of ladders, ropes, and scaffolds and the limitation to no more than occasional stooping, kneeling, crouching, and crawling were designed to account for Barnett's neck, back, and joint pain, as well as Barnett's neuropathy, which the ALJ noted "primarily affect[ed] the

44

feet"). So the ALJ incorporated findings as to the limiting effects of Barnett's numbness on her physical function. *See* Tr. 29. And Barnett hasn't provided a factual or legal basis for her claim that the ALJ wasn't qualified to do so. *See* Doc. 8, at 18.

Barnett also hasn't shown any authority for her claim that the ALJ wasn't qualified to determine her physical abilities and limitations based on the existing record. Barnett provides no facts or legal authority to establish how the ALJ's disability determination might have been enhanced by additional medical opinion evidence of Barnett's monofilament exam results. *See Owens v. Berryhill*, No. 1:18-cv-1043, 2019 WL 2465229, at *8 (N.D. Ohio Feb. 13, 2019) ("Owens has offered no information concerning what evidence further record development could offer that would have enhanced a determination of disability"), *report and recommendation adopted*, 2019 WL 1929695 (N.D. Ohio Apr. 30, 2019). The ALJ wasn't obligated to obtain additional medical evidence to address the combined effect, if any, of findings of numbness in her feet from July 2021; a finding of antalgic gait finding from more than a year earlier in June 2020, *see* Doc. 8, at 17 (citing Tr. 410); and findings of an altered gait and lumbar pain from November 2020, *see id* at 17 (citing Tr. 419, 424). And Barnett hasn't demonstrated that there was any additional evidence necessary for the ALJ to make a proper disability decision. *See Landsaw*, 803 F.2d at 214 (quoting *Turner*, 563 F.2d at 671).

Recall that *Deskin* and its progeny only *potentially* apply, and that there are only two narrow circumstances in which they might. *Kizys*, 2011 WL 5024866 at *2 (emphasis added); *see Phelps*, 2022 WL 18395824, at *9. *Deskin* could only possibly apply here if Barnett could show that the ALJ developed the RFC based on an "outdated" medical source opinion "that [did] not include consideration of a *critical body* of objective medical evidence," which Barnett hasn't done. *See Kizys*, 2011 WL 5024866 at *2. Barnett's additional evidence—singular abnormal exam results confirming symptoms already present in the record which the ALJ acknowledged, considered, and incorporated into the RFC, *see* Tr. 29–30—does not represent a "critical body of objective medical evidence" not accounted for in the medical opinion evidence. *See Monet v. Comm'r of Soc. Sec.*, No. 20-12484, 2022 WL 298130, at *5 (E.D. Mich. Jan. 13, 2022), *report and recommendation adopted*, No. CV 20-12484, 2022 WL 298567 (E.D. Mich. Jan. 31, 2022).

Barnett hasn't established that the numbness in her feet was more than a minimal impairment, and the ALJ's undisputed findings of normal sensation throughout the relevant time period, *see* Doc. 9, at 12 (citing Tr. 30, in turn citing Tr. 374, 382, 397, 410, 449–50, 564, 568, 575, 613), further support a no-more-than-minimal impairment. It's evident that the July 2021 monofilament exam results validated a condition of Barnett's which was known and minimal. *See* Tr. 372–73, 378, 407, 414, 421, 576. This further undermines Barnett's ability to show that the July 2021 exam results represented a "critical body of

objective medical evidence" which had been overlooked by the medical opinions. "Simply put, … the narrow *Deskin* rule does not apply here." *Monet*, 2022 WL 298130, at *5. Barnett cannot establish that her additional objective medical evidence constituted a critical body, and thus she cannot show that the ALJ developed the RFC without considering such critical evidence. So even if *Deskin* were good law, it wouldn't apply. *See Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d at 91; *Kizys*, 2011 WL 5024866 at *2; *Berrier*, 2021 WL 6881246, at *6.

As such, the RFC was supported by sufficient evidence. The ALJ had no duty to further develop the record and she did not err by crafting an RFC without an additional medical expert opinion.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: January 16, 2024

                            */s/ James E. Grimes Jr.*
                            James E. Grimes Jr.
                            U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).